**Garris S. McFADDEN, Plaintiff,**

v.

**BALTIMORE STEAMSHIP TRADE ASSOCIATION et al., Defendants.**

**Civ. No. 71-457-H.**

United States District Court, D. Maryland.

Jan. 3, 1973.

Whitworth Stokes and Boasberg, Hewes, Klores, Smith & Kass, Washington, D. C., for plaintiff.

Anthony A. Abato, Jr., and Cosimo C. Abato, Baltimore, Md., for defendants International Longshoremen's Association and Local 953, ILA.

Barrett W. Freedlander and Niles, Barton & Wilmer, Baltimore, Md., for defendant Terminal Shipping Co.

HARVEY, District Judge:

In this civil action, plaintiff, a Negro longshoreman, seeks injunctive relief and damages under Title VII of the Civil Rights Act of 1964 from International Longshoremen's Association (ILA), from one of its Locals (Local 953) and from Terminal Shipping Company (Terminal), a former employer. Also named as a defendant in the amended complaint was Steamship Trade Association of Baltimore, Inc. (STA), which plaintiff incorrectly referred to as "Baltimore Steamship Trade Association." STA's motion for summary judgment has previously been granted by the Court.

In Count 1 of the amended complaint, plaintiff alleges that the union defendants have violated 42 U.S.C. § 2000e et seq. by denying him membership in Local 953 and equal employment opportunities because of his race. Count 2 is based on § 301 of the National Labor Relations Act, 29 U.S.C. § 141 et seq., and alleges that the union defendants have violated their duty to fairly represent plaintiff as a member of the ILA. Count 3, like Count 1, is also brought under Title VII of the Civil Rights Act but names Terminal alone as the defendant. In Count 3, it is alleged that Terminal discharged plaintiff in 1969 as retaliation for his having filed charges of discrimination against that company with the Equal Employment Opportunity Commission (EEOC), in violation of 42 U.S.C. § 2000e–3(a). In his prayer for relief under Counts 1 and 2, plaintiff asks this Court to enjoin and restrain the union defendants from denying him employment as a checker and from denying him membership in Local 953. Under Count 3, plaintiff asks the Court to enjoin Terminal from intimidating him by firing or threatening to fire him for filing charges of discrimination. Plaintiff further seeks damages in the amount of $26,586 from the unions and $10,739 from Terminal, together with attorneys fees and costs.[1]

*The background facts*

The history and racial composition of the ILA's two general cargo locals in the

---

[1]. At the request of and with the consent of all counsel, plaintiff's claims under Counts 1 and 2 against the unions were tried first and thereafter his claim under Count 3 against the company was tried.

Port of Baltimore is discussed in some detail in this Court's opinion in United States v. International Longshoremen's Association, 319 F.Supp. 737 (D.Md. 1970), aff'd, 460 F.2d 497 (4th Cir. 1972), cert. den. 409 U.S. 1007, 93 S.Ct. 439, 34 L.Ed.2d 300 (1972).[2] Plaintiff is a member of Local 858 which at all times since it was formed in 1914 has been composed almost entirely of blacks. Local 829, since it was chartered in 1913, has been composed almost entirely of whites. In the *ILA* case, this Court held that the maintenance of separate locals for blacks and whites performing the same duties in the same geographical area violated § 703(c)(2) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c) (2). As injunctive relief, it was ordered that Locals 829 and 858 should be merged into a single local and that such one remaining local should maintain a single hiring hall. This Court further ordered that the new local should undertake to adopt seniority system which was fair and objective for all its members, both black and white, and should take affirmative steps to require that the stevedoring companies in the Port employ mechanics, gearmen and foremen on the basis of ability and seniority rather than on the basis of race. However, this Court declined to order that the gang system of hiring longshoremen should be discontinued in the Port of Baltimore, requiring instead certain modifications of the existing system, as more fully set forth in the opinion. This Court's rulings on all of these points in the *ILA* case were affirmed by the Fourth Circuit, and the Supreme Court has recently denied certiorari.[3]

In addition to Locals 829 and 858, the large general cargo locals, there are other smaller labor organizations in the Port of Baltimore that represent longshoremen. These other ILA locals include No. 921 (the grain handlers' local), No. 1355 (the ship ceilers', cattle fitters' and carpenters' local), No. 1429 (the freight handlers' local), and the defendant Local 953 (the checkers' and tallymen's local). None of these small locals was named as a defendant by the government in the *ILA* case, and none is subject to the decree therein entered.

In the Port of Baltimore, STA represents all the stevedoring companies in the area and bargains collectively with all the ILA unions on behalf of its member companies. The collective bargaining agreement negotiated by these parties includes provisions applicable generally to all ILA locals and also other provisions specifically applicable to each separate local. The collective bargainin agreement between STA and ILA for the period October 1, 1968 through September 30, 1971 thus contains a "Checkers' and Tallymen's Agreement" which covers tallying and checking work done by members of Local 953 and by others referred for this work.

The principal duties of a longshoreman employed as a checker include checking cargo from dock to ship and ship to dock, noting its physical condition and count, and supervising the separation of cargo by bills of lading and sub-marks within the bills of lading. Other duties of a checker include checking cargo received from and delivered to trucks, lighters, barges, railroad cars and containers. Such work involves counting items of cargo, checking marks and numbers, making notations of the physical condition and measurement of cargo and other record keeping functions. While there are no specific details or special skills required for the performance of the duties of a checker, it is necessary that a checker be able to read and write legibly, have knowledge of and be able to understand shipping documents, and possess better than average mathematical ability.

Checkers' work is generally more desirable than general cargo work because

---

2. This case is referred to herein as "the *ILA* case."

3. Because of the pendency of these appellate proceedings, the decree in the *ILA* case has not as yet been fully implemented.

of certain pay benefits and guarantees included in that portion of the collective bargaining agreement applicable to checkers and tallymen. For example, persons employed as general laborers or tractor operators under the jurisdiction of Locals 829 and 858 were guaranteed a minimum of 4 hours work under the agreement in effect during the contract years 1968 to 1971, while persons employed as checkers were guaranteed a minimum of 8 hours work under provisions of the same agreement applicable to those referred by Local 953.

Any longshoreman, whether a member of Local 953 or not, can apply for work as a checker. To do so, he must telephone the office of Local 953 between two o'clock P.M. and two-thirty P.M. on the day before the date that he will be available for work. His name is then placed by a representative of Local 953 on the "available for work" list. Between two-thirty P.M. and four o'clock P.M., stevedoring companies place their orders for checkers by telephone. After four o'clock P.M., each longshoreman seeking checkers' work again telephones the office of Local 953 and is advised whether his name has been reached on the list for checkers' work the next day. Referrals for work are made solely on the basis of seniority without regard to whether the individual whose name is on the list is a member of Local 953 or not. A longshoreman who has placed his name on the list and who has recorded a greater number of hours of checkers' work is therefore referred before one on the list with a lesser number of hours.

Plaintiff, who is 42 years of age, has been a member of Local 858 since February 19, 1957. Most of his work has been as a tractor operator, and like other longshoremen in the Port, plaintiff has worked for many different stevedoring companies depending on the availability of work. In the contract years between 1966 and 1971, plaintiff recorded the following hours of work:

| Contract Year | Total Hours |
| --- | --- |
| 66–67 | 1,637 |
| 67–68 | 1,824 |
| 68–69 | 1,502 |
| 69–70 | 1,265 |
| 70–71 | 1,183 |

His gross earnings from longshoring work were some $6800 for 1969, $7300 for 1970 and $7600 for 1971. In addition, plaintiff owns two music stores where he works when he is not employed as a longshoreman.[4]

Since 1968, plaintiff has sought work as a checker and in fact has been so employed on occasion during various contract years before the filing of this action. His checkers' work has been as follows:

| Contract Year | Total Hours |
| --- | --- |
| 67–68 | 51 |
| 68–69 | 134 |
| 69–70 | 53 |
| 70–71 | 16 |

In the contract years 1963–1966, a substantial part of plaintiff's employment as a longshoreman was spent working for Terminal as a tractor-driver. In the contract years from 1966 through 1969, plaintiff spent a considerably lesser portion of his time employed with Terminal. On or about May 24, 1969, plaintiff was discharged by Terminal, and although he has regularly worked for other companies since then, he has spent only a few hours in the employ of Terminal since that date.[5]

*Plaintiff's claim under Count 1*

In Count 1 of the amended complaint, plaintiff claims that the union defendants have denied him membership in Lo-

4. Since November 13, 1972, plaintiff has been Vice President of Local 858 at an annual salary of $15,760.

5. In the "Stipulation of Undisputed Facts," the parties stipulated that plaintiff was discharged by Terminal on May 24, 1969. Although an attempt was made at the trial to claim that the discharge occurred on some other date, the Court is satisfied that May 24, 1969, or possibly the previous day, was the date in question. Indeed, May 24, 1969 was the date fixed by plaintiff when he filed a written charge pertaining to the firing incident with the EEOC on June 16, 1969.

cal 953 and have further denied him employment as a checker because of his race, in violation of 42 U.S.C. § 2000e–2(c). In opposing these contentions, the unions assert (1) that plaintiff has failed to satisfy the statutory prerequisites for the filing of a suit under Title VII of the Civil Rights Act; and (2) that the facts here do not show racial discrimination on the part of these defendants either in connection with plaintiff's inability to become a member of Local 953 or his failure to obtain regular work as a checker.

(a) *Jurisdictional prerequisites to suit*

On March 28, 1968, plaintiff wrote a letter to the officers of Local 858 requesting that his name be placed on the list of availability for any foreman's job, checker's job, timekeeper's job, safety man's job "or any other position which comes to this office as an advancement." On September 23, 1968, plaintiff filed written charges of racial discrimination with the Community Relations Commission of the City of Baltimore. Named as respondents in such complaint were ILA, STA and Locals 858, 953 and 1355. *Inter alia,* plaintiff complained that the requirements for membership in Local 953 were discriminatory.

On October 22, 1968, plaintiff filed with the EEOC the identical charges that he had submitted to the City Commission. No formal action was taken by either the local or the federal agency before January 30, 1969 when plaintiff filed another charge with the EEOC naming solely Local 953 as respondent. In this amended charge, plaintiff alleged that Local 953 limited its membership to whites and conspired with members of STA in denying Negroes entry into higher classified non-supervisory jobs. No formal action was taken by the EEOC for over 2 years. Finally, on March 9, 1971, the Director of the Washington Area Office of the EEOC wrote plaintiff advising him that voluntary resolution of his charges could not be achieved and sending him a Notice of Right to Sue. On April 8, 1971, the Clerk of this Court received plaintiff's complaint, which had been mailed by counsel the previous day.[6] Defendants now argue that plaintiff did not comply with 42 U.S.C. § 2000e–5(b) in filing these charges with the administrative agencies in question.

■ The timely filing of charges with the EEOC is indeed a jurisdictional prerequisite to the institution of a civil suit in this Court under applicable provisions of Title VII of the Civil Rights Act of 1964. Stebbins v. Nationwide Mutual Insurance Co., 382 F.2d 267 (4th Cir. 1967), cert. denied, 390 U.S. 910, 88 S.Ct. 836, 19 L.Ed.2d 880 (1968). In this case, plaintiff is claiming that commencing in 1968, he has been denied membership in Local 953 and employment as a checker because of his race. He filed general charges to this effect with the City of Baltimore agency on September 23, 1968 and with the EEOC on October 22, 1968. Subsequently, when no action had been taken by the City agency, he filed with the EEOC amended and more specific charges against Local 953 on January 30, 1969. On the latter date, more than 60 days had elapsed since plaintiff first filed charges with the Baltimore City agency. The filing of January 30, 1969 was therefore sufficient to permit the maintaining of this suit after plaintiff received notice of his right to sue.

■ Under the circumstances of this case, plaintiff's right to sue is not defeated by the fact that some 2 years passed between the last filing by plaintiff of charges with the EEOC and receipt by him of the notice advising him that he could file a civil action in this Court. Apparently, the Commission during this period was investigating plaintiff's and other longshoremen's charges against Locals 829 and 858. In-

---

6. Although the original complaint was not formally docketed until April 28, 1971, this Court has previously ruled that receipt by the Clerk on April 8 constituted timely filing by plaintiff within the 30 day period required by § 2000e–5(e).

deed, the government's complaint in the *ILA* case was filed on April 22, 1969, and this Court's opinion was issued on December 3, 1970. Some three months after the opinion was filed, plaintiff received the notice in question.

This Court is satisfied that the procedure followed by plaintiff complied with the purpose of § 2000e–5(b) and of other provisions of the Act to give state or local agencies a prior opportunity to consider such complaints and then to permit the EEOC to attempt to resolve the charges without litigation. See Love v. Pullman Co., 404 U.S. 522, 526, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972). To require any additional filing by the plaintiff with the local or with the federal agency under these circumstances would in the language of the *Love* case "serve no purpose other than the creation of an additional procedural technicality." This Court accordingly concludes that plaintiff has satisfied the statutory prerequisites for maintaining this action.

### (b) *Membership in Local 953*

In support of his allegation that the union defendants denied him membership in Local 953 because of his race, plaintiff testified that at various times in 1968 he asked union officials for an application for membership and was told that Local 953 was not then giving out such applications. Later, in 1970, plaintiff was permitted to file a formal application but was not then accepted for membership. He claims that it was because of his race that he was refused an application in 1968 and was later rejected for membership in 1970, in violation of 42 U.S.C. § 2000e–2(c).[7]

The evidence in the case indicates that Local 953 accepted new members only every one or two years. In 1968, there were some 2500 total members of Locals 829 and 853 but only some 260 members of Local 953. Periodically, when the membership of Local 953 became de-

pleted because of the death or retirement of members, or when it was decided for other reasons to increase the membership, applications would be distributed to longshoremen interested in joining the Union.

From the evidence, it is clear that plaintiff was indeed refused an application for membership in 1968, but not because of his race. He was denied such an application because Local 953 was not then accepting any new members. Any white longshoreman applying at the same time as plaintiff in 1968 would also have been refused.

In 1970, Local 953 undertook a membership drive for the purpose of increasing the number of its members. Local 953's Constitution and By-Laws were changed on March 20, 1970 to allow the Union to take in 60 new members through voting, of whom at least 20 were to be those from Local 829 with the highest number of votes, at least 20 were to be those from Local 858 with the highest number of votes, and the remainder were to be those others on the ballot with the highest number of votes. No other special qualifications for membership were necessary for this special drive except that the applicant had to be at least 19 years of age. Previously the Constitution and By-Laws had required that an applicant for membership must have had at least 500 hours of checkers' work for five of the six contract years immediately prior to the filing of the application.

Plaintiff filed a written application for membership on April 3, 1970 and was placed on the ballot together with the other prospective candidates. However, although 20 other blacks from Local 858 were accepted as members of Local 953, plaintiff's application was rejected because he did not receive a sufficient number of votes. 101 members of Local 829 were on the ballot, and a total of 23 were elected. 25 members of Lo-

---

7. Plaintiff also claims in Count 1 that defendants have violated 42 U.S.C. § 1981. The findings herein pertain to a cause of action asserted under § 1981 as well as to one asserted under § 2000e.

cal 858, including plaintiff, were on the ballot and 20 were elected. The other 18 new members elected at the same time came from other locals or had no previous union affiliation at all.[8]

From these facts, this Court concludes that plaintiff was not denied membership in Local 953 because of his race. Plaintiff was well known on the waterfront, having actively sought to be an officer of Local 858 for a number of years. In 1966, he ran unsuccessfully for the position of Recording Secretary of Local 858. In 1968, he was again defeated when he ran for the position of Vice President of that Union.[9] During that year, plaintiff had been disciplined by Local 858. By letter dated March 1, 1968, plaintiff had been directed to appear before the Executive Board of the Local to answer charges of making statements and engaging in conduct detrimental to the interests of his Union. Following such appearance on March 14. 1968, plaintiff was found guilty of the charges, and it was ordered that he be suspended from the Union for six months and prohibited from writing and circulating any literature using the heading of Local 858 for the remainder of the year. It was also required that plaintiff apologize to the other members of the Union.[10]

Under these circumstances, it is not surprising that plaintiff was not one of the 20 black members of Local 858 who were elected to membership in Local 953 in April, 1970. As a black member of Local 858, his chances of being successful in the election of April, 1970 were in fact better than were those of a white member of Local 829. 80% of the black longshoremen from Local 858 who filed applications were elected, whereas only 23% of the white longshoremen from Local 829 were similarly successful. Politically active in union affairs and a controversial figure, plaintiff was not elected simply because he was not as popular as other blacks who were also seeking membership in Local 953 at the same time. This Court concludes from the record here that he was not denied membership in the Union because of his race.

### (c) *Equal employment opportunities*

Plaintiff further claims that he has been denied employment as a checker because of his race. In support of this claim, he relies principally on statistics which show that members of Local 953 have for years been predominantly white. The figures in question are as follows:

| Date | White | Black | Total |
|------|-------|-------|-------|
| 7/1/65 | 191 | 2 | 193 |
| 9/22/68 | 261 | 3 | 274 |
| 4/15/71 | 325 | 24 | 349 |
| 8/15/72 | 310 | 22 | 332 |

However, employment as a checker does not depend on a worker's membership in Local 953. One need not be a member of Local 953 to be referred for checkers' work. There are not enough checkers' jobs each day for those who desire this kind of work, and Local 953 allocates the work solely on the basis of the seniority of the longshoremen who place their names on the list. Plaintiff claims that white longshoremen, having built up considerably more hours of work as a checker than have blacks, usually are given the checkers' jobs because of such seniority. He claims that because of such a system for allocating the work, he has been denied equal employment opportunities by the union defendants.

---

8. 61 members in all were in fact elected because of a tie vote involving two of the candidates.

9. In 1971, he lost again when he ran for the position of President. Finally, in 1972, plaintiff was elected Vice President of Local 858 and commenced his new duties on November 13, 1972.

10. Subsequently, a fine was assessed against plaintiff by Local 858. He disputed the fine, and apparently it was never paid. The dispute continued until June 11, 1969, when plaintiff's check for dues for the first quarter of 1969 was finally accepted.

But plaintiff brings this action solely on his own behalf.[11] This is not then either a class action or, as in the *ILA* case, a suit brought by the government attacking an entire system of allocating work between white and black longshoremen. Plaintiff has produced no evidence of specific acts of racial discrimination practiced against him by representatives of the union defendants. He has done no more than prove that he has not worked regularly as a checker and that Local 953 has been predominantly white for years.

The statistics in evidence of course do suggest that in past years blacks have not had the same opportunity as whites to become members of Local 953 and concomitantly to be employed as checkers. How that occurred and to what extent in the years prior to 1968 has not been shown. However, plaintiff's claim of racial discrimination in this case dates from the Fall of 1968 when he filed his first written charges with the local and federal agencies, thus providing the necessary jurisdictional prerequisites for the pending suit. The evidence in this case does not show that at any time after he actively sought checkers' work in 1968, plaintiff has been either denied membership in Local 953 or denied employment because of his race.

■ What the evidence does show is that it is extremely difficult for any longshoreman in the Port who has not previously done much checkers' work to qualify today for this type of employment. Only by placing his name on the "available for work" list every day and building up his hours of checkers' work on those days when there is enough to go around can an individual gain seniority. This substantial hurdle must be faced by both black and white longshoremen who today have little seniority as checkers. As restrictive as the system is, so long as it does not deny a worker equal employment opportunities because

of his race, it does not offend the Civil Rights Act.

In the recent case of Stebbins v. State Farm Mutual Automobile Insurance Company (4th Cir. October 27, 1972), the Court rejected an argument similar to the one advanced here. In that case, plaintiff had unsuccessfully sought employment as an insurance claims adjuster with several companies and, as proof of discrimination against him, relied on statistical evidence indicating that very few of defendants' claim adjusters were members of minority groups. Finding nothing in the record to support Stebbins's claims of discrimination or retaliation, the Court said the following (slip opinion, pages 4–5):

"Moreover, Congress did not intend by the Civil Rights Act of 1964 to guarantee a job to every person regardless of qualifications. The act does not command that any person be hired merely because he was formerly subject to discrimination or because he is a member of a minority group. Griggs v. Duke Power Co., 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971). Any doubt on this point is removed by 42 U.S.C. § 2000e–2(j) which expressly states that 'preferential treatment [is not to be given] to any individual * * * on account of [a racial] imbalance which may exist.' "

Similarly, the statistics relied on by plaintiff in this case are not sufficient to overcome the substantial evidence in the record showing that he has not been denied employment as a checker because of his race. Other than these statistics, there is no support in this record for plaintiff's claim that the union defendants have denied him equal employment opportunities. No credit will be given to plaintiff's trial testimony to the effect that he could recall "100 of those specific instances" wherein workers with less seniority as a checker than he

---

11. The amended complaint originally alleged a class action under Rule 23, F.R.Civ.P. However, after defendants opposed such allegations and sought discovery relating thereto, plaintiff dropped the class action allegations and limited his suit to one brought solely on his own behalf.

were allocated checkers' work. When he was deposed on August 30, 1972, he had stated that he knew of no one with less experience as a checker who had at any time been given such work ahead of him. The evidence clearly establishes that since plaintiff sought checkers' work in 1968, checker's jobs were allocated solely on the basis of the seniority of the individual longshoreman who had applied for such work. The proof further shows that plaintiff had as much of an opportunity to build up his seniority as had other longshoremen, both black and white.

Neither Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968), nor Robinson v. Lorillard Corporation, 444 F.2d 791 (4th Cir. 1971), support plaintiff's claim against the union defendants in this case. Each of those cases was a class action brought against an employer and a union. The black plaintiffs in those cases challenged systems of job classifications based on departmental rather than employment seniority. Here the plaintiff, suing as an individual, seeks to set aside an industry-wide seniority system for allocating checkers' jobs among all longshoremen in the Port of Baltimore.

### Plaintiff's claim under Count 2

In Count 2 of the amended complaint, plaintiff claims that the union defendants have breached their duty to fairly represent him, in violation of Section 301 of the National Labor Relations Act, 29 U.S.C. § 141 et seq. See Steele v. Louisville and Nashville Railroad, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). A formal charge to this effect had been filed by plaintiff with the National Labor Relations Board on June 5, 1970. The Board found no evidence of a violation of Section 8 of the Act, and on July 2, 1970, advised plaintiff that it was refusing to issue a complaint against Local 953. Plaintiff filed an appeal with the General Counsel of the NLRB. On

September 1, 1970, such appeal was denied.

Plaintiff's claim under Count 2, like that asserted in Count 1, is based on allegations that the union defendants have denied him membership in Local 953 and have further denied him employment as a checker because of his race. As this Court has found, the proof in this case does not support these allegations. The facts here do not show that the unions' conduct toward plaintiff was arbitrary, discriminatory or in bad faith. See Vaca v. Sipes, supra, at 207, 87 S.Ct. 903. For the same reasons stated hereinabove as to Count 1, plaintiff is not entitled to injunctive relief or damages under Count 2.

### Plaintiff's claim under Count 3

Besides filing with the EEOC on January 30, 1969 a charge of racial discrimination against Local 953, plaintiff also filed on the same date a separate charge of racial discrimination against Terminal, STA and 47 other stevedoring companies in the Port. These charges were not served on STA until April 15, 1969, at which time notice was mailed by STA to its member companies. Such notice mentioned that charges of racial discrimination had been filed against the various companies but did not state the name of the complainant. On or about May 24, 1969, plaintiff was discharged by Terminal.

Plaintiff claims that this discharge was retaliatory, in violation of 42 U.S.C. § 2000e–3(a). On the record here, there is no evidence to support this claim other than plaintiff's conclusory assertion on the witness stand that such was the reason for his discharge. Rather, evidence in this case clearly establishes that plaintiff was fired by Terminal for pilferage and that there was ample justification for the action taken.

This Court gives full credit to the testimony of John A. Idzik, a fellow longshoreman, who testified concerning an incident occurring on or about May 24, 1969 when plaintiff and Idzik were both

working as tractor operators at Pier 1 on Clinton Street. Idzik observed plaintiff go into a restricted area where special cargo was locked up, take some drill bits from a box and put them in his pocket. Idzik told plaintiff to put them back, and plaintiff complied. Shortly thereafter, plaintiff opened a carton of pineapple juice in front of Idzik (in the latter's words "deliberately"), took a can out and left the pier. Idzik reported the incident to his superintendent, John Schock, and demanded that something be done about it. Schock in turn told his immediate superior, Joseph P. Schmidt, about the incident. Schmidt, who was in charge of hiring and firing for Terminal, discharged plaintiff that very same day.

Idzik's account of what happened on the day in question was corroborated by the testimony of Schock, Schmidt and Frank J. Mazurek, who was a ship foreman for Terminal. There is no indication in the record that any of these employees of Terminal even knew on the day in question that plaintiff had previously filed charges with the EEOC accusing Terminal of racial discrimination.

This was not the first time that plaintiff had been caught pilfering on the waterfront. On one previous occasion, he had even been prosecuted for stealing two bottles of whiskey from United States Lines. He was jailed briefly and fined $50. On another occasion, he had stolen gasoline while working for Terminal. Although denying the gasoline incident on the witness stand, plaintiff had previously admitted this act of pilferage to Hershey Richardson, who was then and is now President of Local 858. Richardson testified that plaintiff had also been discharged by Terminal on that previous occasion. However, Richardson had interceded for him at that time and, after ascertaining the facts and pleading for mercy, was successful in persuading Terminal to re-hire plaintiff.

Richardson also attempted to intercede on plaintiff's behalf in May, 1969. A week after that discharge, Richardson arranged a meeting with management in an attempt to secure plaintiff's reinstatement. Plaintiff was late for the meeting, and while waiting for his arrival, Richardson again pleaded for mercy and had just about persuaded Schmidt to re-hire plaintiff when the latter arrived. Plaintiff insisted on a hearing and became angry and abusive, claiming that Idzik was lying and that he was being persecuted and railroaded. Plaintiff even had words with Richardson and accused Richardson of not representing him properly. The hearing thereupon proceeded, and after he heard from Idzik and Mazurek concerning the pilferage incident, Schmidt refused to re-hire plaintiff. Richardson did not protest this action because, as he testified, he was satisfied that he had done everything he could do for plaintiff under the circumstances.

Plaintiff's testimony concerning the factual issues in dispute will not be given any credit in this case. On the witness stand, plaintiff was evasive and shifted his position on several different occasions. For example, in his direct testimony, when plaintiff was being questioned concerning the charge that he pilfered pineapple juice from the pier in May, 1969, he attempted to minimize the incident by stating that the cargo in question was damaged and that the taking of such cargo was permitted and even encouraged by management. He testified as follows:

"To my knowledge a lot of pineapple was taken and also to my knowledge it was kind of encouraged because it was just really in the way. I'm sure management knew that after the insurance surveyed it, it was just a matter of waste there that had to be gotten rid of and it stayed there for the longest kind of time until they could get trucks to come in and just scoop the stuff up."

On cross-examination, he denied that he had so testified and specifically denied using the word "encouraged." When pressed, he said that he wanted to

alter his direct testimony and withdraw the statement in question. He finally conceded on cross-examination that no damaged cargo was permitted to be taken away from the pier by longshoremen.

On the record here, it is quite clear that in May, 1969 plaintiff was fired for pilferage and not because he had filed a charge against Terminal with the EEOC. Accordingly, plaintiff is not entitled to injunctive relief or damages under Count 3.

### Conclusion

For the reasons stated, plaintiff is not entitled to injunctive relief, damages or attorneys fees from any one of the three remaining defendants. Judgment is therefore entered in favor of each defendant herein with costs. This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in the foregoing opinion, whether or not expressly so characterized.