Alexis F. BROUSSARD, Sampson Larry, Earnest Evans, Leroy Haggerty, Andrew Vaughns, and Jeff Davis, Jr., Individually and on Behalf of Others Similarly Situated, Plaintiffs,

v.

SCHLUMBERGER WELL SERVICES, a Division of Schlumberger Technology Corporation, Defendant.

Civ. A. No. 68–H–215.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 4, 1970.

Raymon Jordan, Houston, Tex., for plaintiffs.

John B. Abercrombie, Baker, Botts, Shepherd & Coates, Houston, Tex., for defendant.

SINGLETON, District Judge.

*Memorandum and Order:*

This is a class action brought to secure injunctive relief and damages. The five named plaintiffs are all Negroes and they contend that defendant, Schlumberger Well Services, by whom they are employed, has engaged in employment practices prohibited by Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. The Court has jurisdiction of

this action pursuant to 42 U.S.C. § 2000e–5(f) (1970).

The defendant Schlumberger Well Services, a Division of Schlumberger Technology Corporation is in the business of providing highly technical and skilled services to the drilling, exploration and production phases of the oil industry. These services consist principally of the measurement of certain electrical, acoustical, nuclear and mechanical parameters of the bore hole of an oil well and of the formation around and fluids in the bore hole. The product of sale consists primarily of a record of these measurements and an interpretation of their significance. The devices and instruments required to perform the measurement services of defendant are designed by defendant and manufactured by it for its own use. In large part these instruments are manufactured by defendant's employees at its headquarters plant in Houston, Texas.

This suit is limited to the defendant's plant located at 5000 Gulf Freeway, Houston, Texas, and the Materials and Maintenance Departments in that plant.

Defendant employs approximately 2,750 employees throughout the United States. Approximately 1,100 of these employees are employed at the Houston plant. Of the employees at the Houston plant, approximately 500 of them are in the Materials and Maintenance Departments. The Materials Department is the designation given by defendant to the department responsible for the actual manufacture of the instruments used by the field crews. The other 600 employees at the Houston plant include Engineering Department personnel, executive personnel and administrative and clerical personnel.

As of March 15, 1968, the defendant employed approximately 56 Negro persons at its plant at 5000 Gulf Freeway, Houston, Texas, in the Materials and Maintenance Departments. As of March 15, 1968, the defendant employed approximately 394 white persons at its plant located at 5000 Gulf Freeway, Houston, Texas, in the Materials and Maintenance Department.

Throughout the period of their employment with defendant, plaintiffs, Alexis F. Broussard, Sampson Larry, Leroy Haggerty, Andrew Vaughns and Jeff Davis, Jr., have been assigned to either the Materials or Maintenance Departments. All of them have been in classifications below the foreman level. None of the plaintiffs had acquired a high school education or its equivalent on any occasion material to this action.

The plaintiffs are presently employed in defendant's facility in the City of Houston, Harris County, Texas. The plaintiffs are all Negro males. The initial employment dates and classifications of the plaintiffs as of the date of trial are as follows:

| | Date of Employment | Classification Current |
|---|---|---|
| Alexis F. Broussard (formerly employed 3/5/54 to 6/15/58) | 11/20/61 | Assembler A |
| Sampson Larry | 11/4/52 | Painter A |
| Andrew Vaughns | 12/16/52 | Assembler C |
| Leroy Haggerty | 2/28/56 | Machinist A |
| Jeff Davis, Jr. | 5/25/51 | Fabricator B |

On or about October 13, 1966, the named plaintiffs filed charges of racial discrimination in employment against the defendant with the Equal Employment Opportunity Commission. This suit is limited to the charges made by plaintiffs with the Equal Employment Opportunity Commission and those charges specified in the complaint filed in this cause. The Equal Employment Opportunity Commission made a determination that reasonable cause existed to believe defendant was in violation of Title VII of the Civil Rights Act of 1964.

Plaintiffs Broussard, Davis and Larry received from the Equal Employment Opportunity Commission notification

that the Commission had been unable to obtain voluntary compliance with the Act, and did bring civil action in this Court within thirty (30) days thereafter.

Negro employees of defendant in the Materials and Maintenance Departments who are similarly situated are too numerous to bring before the Court and plaintiffs are representative of these Negro employees presently employed in the Materials and Maintenance Departments by defendant.

Defendant does not now maintain any plan, program or practice which constitutes discrimination in employment against Negroes in violation of Title VII of the Civil Rights Act of 1964. Defendant does not now maintain, support or promote any segregated social clubs. At one time, defendant did support social clubs which were essentially segregated, but only one integrated social club remains at present. The defendant has not maintained segregated rest rooms, toilet facilities or locker rooms since on or before July 1, 1965. Negroes have not as a class been denied enrollment in evening education courses sponsored by defendant because of their race.

Prior to 1955, defendant had no requirement that any employee have a high school diploma to qualify for promotion into any job at defendant's plant. In 1955, defendant established a system of salary and job progression for training for skilled craft jobs which allowed employees to move through the craft training program in a systematic pattern. This system was "semi-automatic" in that, at specific intervals in an employer's tenure in the craft training program, the employee's supervisor was required to take positive action to either increase the employee's salary (or promote him to a higher classification) or to hold the employee at his current salary (or in his current classification) or to discharge the employee. This same system of "semi-automatic" progression is still in effect although the classifications, names, and job contents have changed from time to time. The classifications which were included in this salary and job progression system came to be referred to as "mainstream" classifications.

At approximately the same time (1955), defendant adopted a requirement that in order for an employee to be hired or promoted into a "mainstream" job he must have obtained a high school education or its equivalent. This high school education requirement was not, however, strictly enforced until 1958 or 1959.

At the time of the adoption of the craft training progression program and the institution of the high school requirement, the following classifications in the various crafts were in the "mainstream": Utility Man, Second Class, First Class and Leadman. Persons in the following job classifications were required to have a high school education or its equivalent before they were eligible to be promoted into the "mainstream": Shop Assistant, Sub-Assembler, Custodian, Watchman and Building Steward.

Between the time of the institution of the high school education requirement for employment in "mainstream" jobs and the elimination of such requirement, six white employees were hired into the "mainstream" without a high school diploma or its equivalent and two Negroes were promoted into the "mainstream" without a high school diploma. *No Negroes were hired into the "mainstream" without a diploma during this period of time.*

In February of 1966, defendant created two new job classifications below the "mainstream": Shop Operator and Assembler. At the time of the creation of the Shop Operator classification, all

Shop Assistants were Negro. All but one of the employees placed in the Shop Operator classification were Negroes. Employees in the Shop Operator and Assembler classifications were required to have a high school education or its equivalent before they were eligible to be promoted into the "mainstream" classifications.

On February 1, 1968, defendant eliminated the requirement of a high school diploma or its equivalent for promotion into the "mainstream" for employees with at least two years of service with defendant.

Prior to February 16, 1966, plaintiffs Haggerty, Broussard, Davis and Vaughns were all classified as Shop Assistants. On February 16, 1966, plaintiffs Broussard, Davis and Haggerty were reclassified and promoted to the classification of Shop Operator but not effective until March, 1966. Plaintiff, Vaughns remained in the classification of Shop Assistant until September 8, 1968, when he was reclassified and transferred to Custodian. On September 29, 1969, plaintiff Vaughns was transferred and reclassified Assembler C.

The so-called "mainstream" classifications were eliminated on February 1, 1968, and replaced by the job titles of A, B, C and First Class.

Advances within the rate ranges for job classifications below salary grade-6 (salary grades 1–5) are made on the basis of good performance and required minimum time in the grade level (automatic time progression). The required minimum time to progress through the "mainstream" job classifications was four years. The defendant has informal on-the-job training programs which are designed to train employees to become first class Machinists, Mechanics, Painters, Welders, Fabricators, Warehousemen, etc. Promotion and advancement are not formally based on comparative seniority among employees. However, if two equally qualified employees are available for promotion to fill an existing vacancy, the senior employee will be given preference.

The Shop Operator classification was eliminated on February 1, 1968. The Shop Assistant job classification was eliminated on November 3, 1968.

As of May 15, 1968, of the 56 Negroes employed in the Materials and Maintenance Departments by the defendant, only 1 was classified as First Class. As of March 15, 1968, only 2 Negroes had been initially employed in the job in the "mainstream" and each of these two Negroes were employed in the entry level job of Utility Man. An employee hired into the "mainstream" category of jobs before the institution of a high school diploma requirement, was not required to possess a high school diploma to promote to a higher job classification or to remain on the job.

Each of the plaintiffs has been locked out of the "mainstream" job category until 1968 because of the defendant's failure to hire him initially in the "mainstream" and the use of a high school diploma requirement for promotion into the "mainstream."

At approximately the same time defendant instituted the system of progressive salaries and job classifications, and the high school requirement, defendant instituted a policy that employees be required to take and pass a written examination as a prerequisite to being promoted to the First Class classification (the top classification in the "mainstream"). These tests were devised by defendant's supervisory employees, were related to the jobs required of employees taking the test, and were administered on a nondiscriminatory basis. In order to be eligible to take the written examination for First Class, employees were required to pass a practical examination administered by their immediate supervisors. There has been no requirement that a written examination be passed for promotion to First Class since February 1, 1968. Plaintiff Sampson Larry, until February 1, 1968, had to take and pass this test in order to be promoted to First Class.

There is no evidence that defendant has discriminated against the individual plaintiffs or any other Negro employee because of their race in granting or withholding wage increases or promotions or in classifying such plaintiffs, except for the effect of the high school education requirement, discussed above and below. The practice of defendant in granting to its supervisors the right to determine the qualifications of employees and to grant or withhold wage increases and/or promotions is nondiscriminatory.

■ This case is appropriately a class action under Rule 23(b) (2). The class is composed of Negro employees in the Materials and Maintenance Departments of the defendant's plant, who have been subjected to the discriminatory policies and practices complained of by the plaintiff in their charges filed with the Equal Employment Opportunity Commission. It is clear that a class action may generally be maintained on behalf of an individual who has exhausted his administrative remedies and also on behalf of others similarly situated who have not so exhausted such remedies where the remedy sought is solely a prohibitive injunction. Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968). Under certain circumstances, plaintiffs may secure individual remedies such as reinstatement and award for back wages for members of the class who have not exhausted their administrative remedies. Local 186, International Pulp, Sulphite and Paper Mill Workers v. Minnesota Mining and Manufacturing Co., 304 F. Supp. 1284 (N.D.Ind. June 2, 1969).

In the present case, plaintiffs Vaughns and Haggerty did not receive the thirty day letter from the Commission notifying them of their right to file this suit. Plaintiffs Vaughns and Haggerty both filed charges with the Commission on or about the same date that the other three plaintiffs filed their charges. The failure of these two plaintiffs to receive the thirty day letter resulted either from administrative oversight or from being lost in the mails. The Court is convinced that these plaintiffs have exhausted their administrative remedies. Exhaustion notwithstanding, the Court is convinced that it can fashion individual remedies for these plaintiffs who are members of the class; who are named plaintiffs in the present lawsuit; and whose particular factual contentions have been presented to the Court.

■ Defendant in this case is not presently engaged in any discriminatory employment practices. The question is whether by the imposition of employment and promotion standards, neutral on their face, defendant has succeeded in locking the victims of racial prejudice into inferior positions. Facially neutral standards may not be imposed where they perpetuate the effects of previous racial discrimination, unless these standards are required by an overriding legitimate business purpose, e. g., the requirement that typists be able to type. Local 189, United Papermakers & Paperworkers v. United States by Mitchell, 416 F.2d 980 (5th Cir. 1969); Local 53 of International Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); Quarles v. Philip Morris, Inc., 279 F. Supp. 505 (E.D.Va.1968). As the Court said in *Quarles, supra,* at 516: "It is * * * apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act."

The issues presented in this case by the high school education requirement have been considered in the case of Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970). In *Griggs*, Negro employees brought suit under the Equal Employment Act contending that certain educational and testing requirements of the company discriminated against Negroes and hence were violative of the

Act. The District Court had found that the company had engaged in discriminatory employment practices prior to the passage of the Civil Rights Act. The Court also found that the company was not presently discriminating in its promotion and transfer policies against Negro employees.

The company's organizational structure provided for five main departments: (1) Operations; (2) Maintenance; (3) Laboratory and Tests; (4) Coal-Handling; and (5) Labor. Prior to 1966 no Negro had ever held a position in any department other than the Labor Department. The company had engaged in a policy of hiring Negroes only into the Labor Department which was the lowest paid department. In 1955 the company had instituted a new policy with regard to hiring and advancement; a high school education or its equivalent was thenceforth required for all new employees, except to those in the Labor Department. The new policy also required an incumbent employee to have a high school education or its equivalent before he could be considered for advancement from the Labor Department. The company subsequently amended its promotion and transfer requirements by allowing incumbent employees who did not have high school educations or its equivalent to become eligible for transfer or promotion by taking and passing two tests.

While the court upheld the high school education requirement and the testing requirement, it distinguished between those Negro employees hired before these requirements were established and those hired after. With regard to the six Negro employees who were hired before the establishment of these requirements, the court held that these requirements were violative of the Equal Employment Act as applied to these plaintiffs. The court said:

"Those six Negro employee-plaintiffs without a high school education or its equivalent who were discriminatorily hired only into the Labor Department prior to Duke's institution of the educational requirement in 1955 were simply locked into the Labor Department by the adoption of this requirement. Yet, on the other hand, many white employees who likewise did not have a high school education or its equivalent had already been hired into the better departments and were free to remain there and be promoted or transferred into better, higher paying positions. Thus, it is clear that those six plaintiff Negro employees without a high school education or its equivalent who were hired prior to the adoption of the educational requirement are entitled to relief; the educational requirement shall not be invoked as an absolute bar to advancement, but must be waived as to these plaintiffs and they shall be entitled to nondiscriminatory consideration for advancement to other departments if and when job openings occur.

"Likewise, as to these same six Negro plaintiffs, the testing requirements established in 1965 are also discriminatory. The testing requirements * * were established as an approximate equivalent to a high school education for advancement purposes. Since the adoption of the high school education requirement was discriminatory as to these six Negro employees and the tests are used as an approximate equivalent for advancement purposes, it must follow that the testing requirements were likewise discriminatory as to them. These six plaintiffs had to pass these tests in order to escape from the Labor Department while their white counterparts, many of whom also did not have a high school education, had been hired into departments other than the Labor Department and therefore were not required to take the tests. Therefore, as to these six plaintiffs, the testing requirement must also be waived and shall not

be invoked as a bar to their advancement." 420 F.2d at 1230–1231

█ The present case falls within the holding of the court in *Griggs*. It is clear from the testimony that prior to 1966 Schlumberger did engage in discriminatory employment practices. The Company hired all Negroes, or at least the overwhelming majority, into the shop assistant classification. It is equally clear that the company is not presently engaging in discriminatory employment practices. However, as in *Griggs*, Schlumberger's Negro employees were locked into the shop assistant or shop operator classification by the educational requirements that Schlumberger sought to impose. At the present time Negroes are able to advance into the "mainstream" if they are qualified. But for an approximately two year period Schlumberger's Negro employees were locked into lower echelon jobs. All the plaintiffs in this case were initially hired by Schlumberger prior to the institution of the educational requirements. Therefore, the reasoning and the holding in *Griggs* should apply. To the extent that these plaintiffs were locked in by the company's educational requirements they were damaged by a discriminatory practice. During the two year period that plaintiffs were locked in the shop operator's position they could not advance regardless of their qualifications due to the discriminatory effects of the company's educational requirements. The net effect of the company's original discriminatory hiring policy, coupled with the educational requirements, was to discriminate against Negroes as a class regardless of their qualifications.

█ The only issue that remains for discussion is that raised by defendant's testing requirement. The only plaintiff affected by this requirement was Sampson Larry. Plaintiff Larry never took the written examination for promotion to First Class Painter. In fact, no employee was promoted to First Class Painter until after February 1, 1968. Plaintiff Larry failed to pass the practical examination which was a prerequisite to the First Class written examination, and was not in the opinion of his supervisor qualified as a First Class Painter. The Court is not persuaded that the failure to allow Mr. Larry to take the written examination for First Class Painter was racially motivated. A man must prove himself on the job before he is allowed to take the written examination. The supervisor's estimate of Mr. Larry's ability is a product of business judgment, which this Court will not second-guess.

The facts as developed with regard to Mr. Larry fail to show any discriminatory effects of the testing requirement. In fact, plaintiffs have completely failed to show that the testing requirement in any way discriminated against Negroes as a class. Plaintiffs argue for what, in effect, amounts to a *per se* rule that the use of a test that has not been professionally validated as to job relatedness is a discriminatory practice. This Court is convinced that the tests in question were job related in the very practical way that a typing test is related to the job of typist. However, in the absence of a showing of a discriminatory effect of the testing requirement upon Negroes as a class any further discussion of job relatedness would be fruitless. Try as it may, plaintiff cannot establish the existence of a discriminatory practice without demonstrating the discriminatory effect of that practice on Negroes as a class.

Therefore, for the reasons stated above, plaintiffs should be granted injunctive relief to the extent that defendant is prohibited from reinstituting any of its past overt discriminatory practices. Defendant should be permanently enjoined from discriminating with respect to hiring, assignment, promotion, compensation, training or other forms, conditions or privileges of employment on the basis of race or color. Further, defendant should be permanently enjoined from reinstituting a requirement that

employees possess a high school diploma or G.E.D. equivalent for promotion to any job in the Material or Maintenance Departments or as a condition for remaining on any job in the Material or Maintenance Departments, in a situation where Negroes were discriminatorily hired into a lower echelon job before the institution of the requirement. Defendant should be permanently enjoined from reinstituting a policy or practice of sponsoring racially segregated employee social clubs; from reinstating a policy or practice of maintaining racially segregated rest room facilities; and, from reinstating a policy or practice of classifying Negro employees in certain job classifications because of their race or color.

In addition, judgment should be entered awarding damages to the four plaintiffs who were locked in by the educational requirements in question. The Court finds that plaintiff A. F. Broussard was damaged in the amount of $962.00; plaintiff Leroy Haggerty in the amount of $1,261.00; plaintiff Jeff Davis, Jr., in the amount of $2,098.00; and, plaintiff Andrew Vaughns in the amount of $2,052.00. These amounts reflecting back wages for the period between July 13, 1966, and March 15, 1970. The measure of damages being the difference between plaintiffs' actual earnings and what they would have earned if not locked into lower echelon positions. Judgment should also be entered that plaintiff Larry take nothing, in that he was not damaged by any discriminatory employment practices, as that term is defined by Title VII of the 1964 Civil Rights Act.

Plaintiffs should be awarded reasonable attorneys' fees in the amount of $7,770.00.

The Clerk will notify counsel for plaintiff to draft an appropriate decree in accordance with this Memorandum and Order for submission to the Court by August 17, 1970, after first obtaining approval of opposing counsel as to form.