Colonel Hill **WILSON**, Plaintiff,

v.

**WOODWARD IRON COMPANY, a Division of the Mead Corporation, a corporation, Defendant.**

**Civ. A. No. 70–943.**

United States District Court,
N. D. Alabama, S. D.

Aug. 22, 1973.

U. W. Clemon, Adams, Baker & Clemon, Birmingham, Ala., for plaintiff.

William F. Gardner, John J. McMahon, Jr., Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This case was tried before the Court without a jury on August 20, 1973. Having considered the evidence and the briefs submitted by counsel, the Court hereby enters the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

### GENERAL

1. This suit is an action instituted and maintained under the Civil Rights Act of 1866 (42 U.S.C. § 1981), which provides in relevant part that all persons shall have the same right to make and enforce contracts as is enjoyed by white citizens.

2. The plaintiff, Colonel Hill Wilson, is a black male citizen of the United States and resides in Jefferson County, Alabama.

3. (a) The defendant, Woodward Iron Company (herein referred to as "the Company") is a corporation operating a plant in Woodward, Alabama.

(b) This plant is composed of departments known as the Furnace Department and the Transportation Department. Prior to January of 1973, the Furnace Department operated blast furnaces and an electric furnace. The blast furnaces were permanently closed in January of 1973. The Transportation Department consists of the operation of diesel locomotives and railroad cars over the Company's railroad system for the purpose of transporting raw materials and finished products.

(c) Prior to the closing of the blast furnaces in January of 1973, there were approximately 600 employees in the Furnace and Transportation Departments.

As the result of the closing of the blast furnaces, the work force has been reduced to approximately 150 employees. Of these 150 employees, 90 are white and 60 are black.

4. The plaintiff worked in the Transportation Department throughout his period of employment with the Company.

5. The position which supervises the railroad operations is known as Yardmaster. There are four Yardmasters, three of whom are white and one of whom is black.

6. The production and maintenance bargaining unit in the Furnace and Transportation Departments is represented by the United Steelworkers of America, AFL–CIO, and its Local Union No. 1099 (herein referred to as "the Union"). The Union has been the collective bargaining representative since the early 1940's. The current collective bargaining agreement between the Company and the Union was entered into on October 1, 1971.

7. The plaintiff's work record with the Company consisted of the following, in chronological order:

(a) August 27, 1964: Negligence in the performance of his job as a Switchman.

(b) April 9, 1966: Negligence in the performance of his job as a Switchman.

(c) May 13, 1966: Negligence in the performance of his job as a Switchman.

(d) March 14, 1968: Absenteeism.

(e) July 5, 1968: Absenteeism.

(f) November 4, 1968: Absenteeism.

(g) February 23, 1970: Negligence in the performance of his job as a Switchman.

(h) July 2, 1970: Absenteeism.

(i) November 8, 1970: Negligence in the performance of his job as a Switchman.

(j) August 16, 1971: Absenteeism.

## II.

### THE PLAINTIFF'S CLAIMS

The claims asserted by the plaintiff are the following:

1. The claim that he received a 10 day disciplinary suspension in February of 1970 in retaliation for having filed a charge with the Equal Employment Opportunity Commission in September of 1967.

2. The claim that he was discharged in November of 1970 (the discharge being subsequently reduced to a suspension) in retaliation for having filed a charge or charges with the Commission.

3. The claim that in April of 1967 he was denied promotion to the position of Foreman and subjected to a test which was not validated.

4. The claim that he was required to use a segregated bathhouse.

## III.

### THE 10 DAY DISCIPLINARY SUSPENSION

#### A. FINDINGS OF FACT:

1. The claim that the plaintiff received a 10 day disciplinary suspension for having filed a charge with the Commission is premised on a charge which he filed on September 11, 1967 alleging that he had been discriminated against in April of 1967 by not being promoted to the position of Section Foreman. [At the time this charge was filed, Section 706(d) of Title VII of the Civil Rights Act of 1964 provided that a charge was to be filed within 90 days after the alleged unlawful employment practice occurred, and the charge was not filed within that period of time. However, since this action is being maintained under the Civil Rights Act of 1866 and not under Title VII, the point is not material to the resolution of the case].

2. The 10 day disciplinary suspension arose out of a railroad collision which occurred on the afternoon of February 23, 1970. The fact regarding this collision are as follows:

(a) The plaintiff was working as a Switchman on a five member train crew. The names, race, and jobs of this crew were the following:

(1) Colonel Hill Wilson—Black—Switchman.

(2) E. L. Calfee—White—Engineer.

(3) Jack Bullard—White—Fireman.

(4) Allison Clark—Black—Switchman.

(5) James Martin—Black—Conductor.

(b) The collision occurred on a structure known as the Stockhouse Trestle. This is a trestle which is located approximately 50 feet from the ground, with storage bins underneath in which raw materials were dumped from railroad cars for use in the furnace operations. The track extended across the length of the Stockhouse Trestle. There was a butting block and a guard rail at the end of the trestle.

(c) The plaintiff had worked as a Switchman on trains on the Stockhouse Trestle on many occasions prior to the collision in question.

(d) The train was composed of the diesel engine and 13 cars. The engine was at the rear pushing the cars, so that the lead car was the head-end of the train.

(e) There was another car, not connected with the train, which was standing on the track on which the train was moving. This car was located near the end of the track where the trestle drops off 50 feet to the ground.

(f) As the train started down the track on the trestle, the plaintiff was riding with the Conductor and the other Switchman on the lead car. As it travelled down the track, the other Switchman and the Conductor stepped off the car to a walkway adjacent to the track. The plaintiff remained by himself as the Switchman on the lead car.

(g) The car which was standing at the end of the track was visible to and had been observed by the plaintiff throughout the train movement in question. The track is a straight track, without any curves, it was during daylight hours, and the weather was clear. The plaintiff first saw this car when the lead car entered the trestle, and he continued to observe the car from his position on the lead car as the train travelled down the track.

(h) The Conductor, who was standing on the walkway adjacent to the track, was giving the signal known as "Come along slow." He was on the left-hand or Fireman's side of the train, so that Fireman would relay the signals from the Conductor and Switchman to the Engineer who was on the right-hand side of the train.

(i) When the lead car on which the plaintiff was riding was approximately 25 feet away from the car which was parked on the track, the plaintiff stepped off the car and gave the signal known as the "wash-out". The signal means that the engine should be placed into an emergency application of the brakes. The Conductor and the other Switchman relayed this signal to the Fireman.

(j) The plaintiff did not give any signal other than the wash-out signal.

(k) The fireman did not relay the wash-out signal to the Engineer and instead gave him a normal stop signal. Even if the Fireman had relayed the wash-out signal, it would have been too late to have stopped the train.

(l) The lead car on which the plaintiff had been riding collided with the parked car. The force of the collision tore the body of the parked car from the wheels and knocked the parked car up and over the butting block and guard rail at the end of the trestle. The body of the car fell the 50 feet to the ground below.

3. This collision resulted in the destruction of the parked car and damage to the electric furnace. The total monetary cost resulting from the collision was $9,715.36.

4. The Union contract provides for the initial procedure of a five day suspension subject to discharge and for the matter to be investigated and discussed by the Company and the Union during such five day period before a final decision is reached. In accordance with this provision, the initial action was that Mr.

Bullard (the Fireman) and the plaintiff were suspended for five days subject to discharge.

5. The collision was investigated by Robert M. Ray, who was at the time Assistant Transportation Superintendent and is now Transportation Superintendent. Based on his investigation, Mr. Ray set the following disciplinary penalties:

(a) The fireman, who is white, was given a 15 day disciplinary suspension for his dereliction in not relaying the wash-out signal.

(b) The Engineer, who is white, was given a 3 day disciplinary suspension.

(c) The plaintiff received a 10 day disciplinary suspension for his dereliction in not stopping the train sooner by a normal stop signal and for waiting until it was too late to give the wash-out signal.

6. The Conductor and the other Switchman were considered to have been blameless and were not given any discipline.

7. The sum total of the disciplinary penalties assessed by the Company were that the member of the crew who received the most substantial discipline was white and that the members of the crew who received no discipline were black.

8. Mr. Ray was not aware that the plaintiff had filed a charge with the Commission at the time he investigated the collision and set the disciplinary penalties.

9. The collective bargaining agreements between the Company and the Union contain a grievance and arbitration procedure for the resolution of complaints by employees. The plaintiff filed a grievance on March 20, 1970 under this grievance and arbitration procedure claiming that the 10 day suspension assessed against him was not justified because he was not guilty of any dereliction in connection with the collision. The Fireman similarly filed a grievance protesting the 15 day suspension assessed against him.

10. These grievances filed by the plaintiff and by the Fireman were both processed by the Union to arbitration. The hearing was held on June 26, 1970 at the Federal Mediation & Conciliation Service in Birmingham, Alabama. The Arbitrator for the cases was Paul M. Hebert, who was and is Dean of the Law School of Louisiana State University. The attorney present to represent the grievants was Thomas N. Crawford, Jr. of the Cooper, Mitch & Crawford law firm. The Company was represented in the case by its present counsel in this trial.

11. The plaintiff came to the hearing with his present counsel. There is a conflict in the evidence regarding the events resulting from the presence of the plaintiff's personal attorney. On the plaintiff's side, it is contended that the Arbitrator, Mr. Crawford, and Mr. Gardner stated that the plaintiff's personal attorney could not be present at the hearing. The defendant's side of this disputed point is that no such statements were made and that the Arbitrator's ruling was in fact that the plaintiff's attorney could remain and advise and consult with him during the hearing, although the case itself would have to be presented by Mr. Crawford as the attorney for the Union. In either event, the plaintiff withdrew from the hearing on the advice of his personal attorney. The case for the plaintiff, as well as the Fireman, was thereafter presented to the Arbitrator by Mr. Crawford.

12. Dean Hebert took the case under consideration at the conclusion of the evidence and the submission of briefs and entered his decision on August 5, 1970. The Arbitrator's decision was that both the 10 day suspension received by the plaintiff and the 15 day suspension received by the Fireman were justified, and the grievances were therefore denied.

13. With respect to the plaintiff, Dean Hebert found the following facts:

(a) "He was, in the Arbitrator's opinion, seriously at fault."

(b) "After weighing the pros and cons in Mr. Wilson's case, I find, as a conclusion of fact, that he was at fault and his fault was a contributing cause of the accident."

(c) "[T]here is no basis for any feeling on Mr. Wilson's part that racial discrimination influenced the Company's decision."

(d) "[T]his record abundantly shows that Mr. Wilson's rights were properly protected and all available arguments in his behalf were presented by the Union's attorney in the matter."

## B. CONCLUSIONS OF LAW:

■ 1. It is well-settled in this Circuit that the decision of an Arbitrator on the claim at issue is properly to be considered as evidence by the Courts. Hutchings v. United States Industries, Inc., 428 F.2d 303, 314, n. 10 (5th Cir. 1970), citing Judge Allgood's opinion in United States v. H. K. Porter Co., 296 F.Supp. 40, 109–110 (N.D.Ala.1968). The Court has accordingly given consideration to the findings and decision by Dean Hebert on the plaintiff's claim protesting the 10 day suspension. At the same time, these findings and decision have been considered only as evidence together with all the other evidence in the case. The Fifth Circuit has authorized the District Courts to defer to the decisions of Arbitrators when certain standards are satisfied. Rios v. Reynolds Metals Co., 467 F.2d 54 (5th Cir. 1972). However, the Company has not argued that the Court should in any way defer to Dean Hebert's decision.

2. It is not the function of the Court to sit in review on the reasonableness of the 10 day disciplinary suspension as such or to conduct an appellate review of Dean Hebert's decision that the plaintiff was seriously at fault. The issue is whether the suspension constituted racial discrimination or retaliation for the charge which the plaintiff filed in 1967.

■ 3. The conclusion of the Court is that the 10 day suspension was not racial discrimination or retaliation against the plaintiff for having filed a charge. This conclusion is based, inter alia, on the following facts:

(a) The Company official who investigated the collision and assessed the suspension was not aware that the plaintiff had filed a charge.

(b) If the Company had been "out to get" the plaintiff, as he argues, it is not reasonable to think that it would have waited for the two and a half years between the filing of the charge in 1967 and the collision in 1970 to have done so, particularly since the plaintiff's record of absenteeism could have provided the vehicle for such action at an earlier time. Compare Terrell v. Feldstein Co., 5 EPD ¶ 8039 (N.D.Ala.1972), aff'd, 468 F.2d 910 (5th Cir. 1972), where Chief Judge McFadden pointed out that "The termination of the plaintiff's employment occurred approximately eleven months after he sought promotion as a salesman and more than six months after he filed charges against his employer with the EEOC. His termination coincided with a seasonal reduction in force and was not done because he filed charges with the EEOC or because of his race."

(c) The contention that the 10 day suspension was retaliation is not reasonably reconcilable with the fact that the white employee received a 15 day suspension.

(d) The plaintiff was neither the only nor the first black employee to file charges with the Commission against the Company.

## IV.

### THE DISCHARGE CLAIM

A. FINDINGS OF FACT:

1. This issue arose out of another railroad collision which occurred on November 8, 1970 when the plaintiff was

again working as a Switchman on a five member train crew. The sequence of events was as follows:

(a) There were nine railroad cars standing on the Back Track in the Ore Yard. The Conductor—who was James Martin—instructed the plaintiff to obtain four of the cars to be taken by the train to the ore bin.

(b) The engine came into the Back Track pushing several cars ahead of it. The plaintiff coupled the lead car into the first of the nine cars on the track. He then went back to the coupling between the fourth car and the fifth car and uncoupled these cars in order to take out four cars and leave five cars on the track.

(c) The five cars had hand brakes which could have been set in order to secure the cars. The plaintiff was aware at the time of the fact that the hand brakes were not set on any of these five cars. He did not set the hand brakes on any of the cars. He similarily did not chock the wheels on any of the five cars with blocks of wood that were available for that purpose.

(d) After he had uncoupled the cars, the plaintiff signalled the train to back up, and he rode off on the train.

(e) The plaintiff was aware of the fact that the Back Track was a downgrade track.

(f) The five cars which he uncoupled rolled down the track and collided with cars which were standing on an intersecting track.

(g) The monetary cost of this collision was $3,358.88.

2. The plaintiff's responsibility for this collision is the subject of sharp conflict in the evidence. The facts are found to be as follows:

(a) The plaintiff contends that he looked back at the five cars for a period of approximately three minutes as the train moved away and that the cars were still standing on the track. In contrast, Mr. W. C. Dockery, an employee who was working on another train in the Ore Yard and witnessed the occur-

rence, says that the cars started rolling as soon as the plaintiff uncoupled them and that the plaintiff watched them roll for a moment and then turned around and rode off on the train while the cars were still rolling. The plaintiff's rejoinder is that he and Mr. Dockery had a verbal altercation several years ago and that Mr. Dokery was retaliating against him.

(b) Even without Mr. Dockery's eyewitness recitation of the occurrence, the plaintiff was derelict in the performance of his job. There is no dispute with the fact that the track was a downgrade, that the plaintiff knew it was a downgrade, and that he did nothing to secure the cars by setting the hand brakes or chocking the wheels. His argument that it was "not the practice" to set hand brakes or chock wheels on this track is not substantiated by the weight of the evidence. It may be that some Switchmen have left cars on this track without setting hand brakes, but if so, that would prove only that some other employees have taken dangerous short-cuts. Like automobile drivers who pass on hills and curves, some may survive it, but their actions certainly do not establish that it is a proper practice.

(c) The plaintiff was depending completely on the air brakes to hold the five cars against rolling down the track. In addition to the evidence that the plaintiff watched the cars roll off and that he was derelict in not setting hand brakes, the evidence further shows that the plaintiff did not have the air brakes in operation on these cars.

3. This collision was again investigated by Robert M. Ray, who concluded that the plaintiff should be discharged. Mr. Ray was not aware of any charges filed by the plaintiff when he investigated this collision and concluded that the plaintiff should be discharged.

4. The plaintiff filed a grievance protesting this discharge, and it was processed by the Union to arbitration. Prior to the hearing before the Arbitrator, the case was settled by Jerome A.

Cooper of the Cooper, Mitch & Crawford law firm as attorney for the Union and the defendant's present counsel as the Company's attorney. The terms of this settlement agreement were that the discharge would be rescinded and he would be reinstated to his job without back pay and that he would be paid the vacation pay he would have received if he had not been discharged.

5. In accordance with this settlement, the plaintiff returned to work on May 17, 1971, and was paid the amount of vacation pay which he would have received.

## B. CONCLUSIONS OF LAW:

■ 1. The initial question to be resolved is whether the plaintiff, having accepted reinstatement and vacation pay under the settlement agreement, is now entitled to repudiate this agreement by claiming back pay for the period during which he was off from work. The following points are relevant to this question:

(a) The plaintiff's argument is that he agreed to the settlement without consulting with his personal attorney. According to him, Mr. Jack Ryan, a representative of the United Steelworkers of America, told him that he did not have time to call his lawyer. It is not necessary to resolve this dispute. The controlling facts are that the plaintiff himself had placed the case in the hands of the Union by filing the grievance under the grievance and arbitration procedure of the Union contract, and he cannot reasonably ask the Court to disregard the agreement which was negotiated for him by the Union attorney on the theory that he should also have had the services of his personal attorney.

Moreover, the plaintiff had ample opportunity to consult his personal attorney after the settlement had been negotiated, but he did not do so. He instead accepted the benefits of the agreement by returning to work and accepting the payment of vacation pay and thereby ratified the settlement agreement.

■ (b) The settlement of grievances, as well as their resolution by Arbitrators, is properly to be considered by the Courts. Hutchings v. United States Industries, Inc., supra. The settlement agreement in this case was fair and reasonable, and the plaintiff should not be allowed to accept the provisions of the settlement which were to his benefit and repudiate the provision which was to his detriment.

■ 2. Analyzing the case without consideration of the settlement agreement, the action of the Company in discharging the plaintiff was not racial discrimination or retaliation and was based on the plaintiff's negligence in the performance of his job and his past record.

3. The majority of the employees who have been discharged by the Company for misconduct have been white and not black. The plaintiff nevertheless has argued that other employees have been involved in railroad collisions and were not discharged. These employees have been both black and white. The answer to the argument is that the degree of discipline is dependent on such factors as the degree of fault and the employee's past work record, and the showing of the evidence is that the plaintiff's fault and his past record was such that the action taken in this case was neither discriminatory nor unreasonable.

## V.

### THE PROMOTION CLAIM

#### A. FINDINGS OF FACT:

1. The position of Section Foreman is responsible for supervising the Section Crew in the maintenance, repair, and installation of track, switches, and related equipment. In the past, there were three Section Foremen, and there was also a Track Supervisor over the Section Foremen. There is now only one Section Foreman and no Track Supervisor.

2. On April 18, 1967, a temporary vacancy occurred in the Section Foreman position because of the illness of

one of the regular Foremen. The plaintiff was working on the Section Crew at the time as the result of a reduction in the work force in the Switchman job which he had been working. He had been on the Section Crew for approximately two weeks. Prior to working as a Switchman, he had also worked on the Section Crew.

3. The Track Supervisor used a list of 12 questions in evaluating the qualifications of employees for the Section Foreman position. These questions were the following:

—How wide is the gauge of a track supposed to be?

—How long is a grade tie?

—What distance is a guard rail spaced?

—How many grade ties go under a 39 foot rail?

—How many grade ties go under a 33 foot rail?

—What distance are ties supposed to be spaced?

—How many switch ties go in a No. 7 switch?

—How many switch ties go in a No. 8 switch?

—How many switch ties go in a No. 9 switch?

—How long is a No. 7 switch lead?

—How long is a No. 8 switch lead?

—How long is a No. 9 switch lead?

4. All of these questions were related to the track work supervised by the Section Foreman.

5. The questions were set forth in a document used by the Track Supervisor in asking employees these questions. The questions were asked and answered orally.

6. The plaintiff was asked these questions in connection with the temporary vacancy in the Section Foreman job on April 18, 1967. The weight of the evidence substantiates the position that the plaintiff did not give the correct information called for by any of the questions.

7. The temporary vacancy in the job was filled with an employee named Herbert Eugene Sellers. Mr. Sellers was white and had not been with the Company as long as the plaintiff. He is no longer with the Company. The plaintiff alleges that Mr. Sellers was not asked the 12 questions which were asked of him. The facts are that while he was not asked the questions that day, he had previously filled temporary vacancies in the job, had been asked the list of questions before he first filled a temporary vacancy in the job, and had given the correct answers to the questions.

8. Among the standards used in evaluating the qualifications of employees for Foreman positions are knowledge of the work, ability, a good employment record, knowledge and efficiency.

9. The Section Foreman job has been held by black employees both before and after 1967.

10. The plaintiff returned from the Section Crew to his Switchman job approximately two weeks after this occasion.

B. CONCLUSIONS OF LAW:

1. An employer is entitled to select the best qualified applicant for a job. As Chief Justice Burger has expressed it in writing for the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L. Ed.2d 158 (1971), "Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant." The Fifth Circuit has similarly held, in a case involving jobs in the railroad industry, that discrimination had not been proven because it had not been shown "that the blacks' qualifications were equal or superior to the hired whites'." United States v. Jacksonville Terminal Co., 451 F.2d 418, 446 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92

S.Ct. 1607, 31 L.Ed.2d 815. This principle has similarly been applied by Chief Judge McFadden of this District in Terrell v. Feldstein Co., 5 EPD ¶8039 (N.D.Ala.1972), aff'd, 468 F.2d 910 (5th Cir. 1972).

■ 2. The plaintiff was rejected for the temporary vacancy in the Section Foreman job because he was considered not to be the best qualified for the job, and not because of race. This conclusion is based on the following facts:

(a) The Section Foreman job has been held by black employees.

(b) Other Foreman positions in the Furnace and Transportation Departments have been and are being held by black employees.

(c) One of the standards used in the selection of Foremen is a good work record with the Company, and the plaintiff's work record was not satisfactory. Another of these standards is knowledge of the job, and the plaintiff's answers to the questions regarding the job showed that he lacked the knowledge needed for the performance of the job.

3. The remaining question concerns the legality of the questions used in evaluating the qualifications of employees for the Section Foreman job. The following points are relevant in the resolution of this question:

(a) Although this is not a Title VII case, the principles which have been developed by the Courts in their consideration of Title VII cases are properly to be applied by analogy.

(b) The guiding principles are that "Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful", but that if they disqualify blacks "at a substantially higher rate than white applicants", they must be shown to be "demonstrably a reasonable measure of job performance." Griggs v. Duke Power Co., 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971). As expressed by Judge Pointer

in Buckner v. Goodyear Tire & Rubber Co., 339 F.Supp. 1108, 1114 (N.D.Ala. 1972), aff'd, 476 F.2d 1287 (5th Cir. 1973), "The court concludes from the evidence that the company has carried its burden—that there is a demonstrable relationship between the tests used and the job (i. e., participation in the four year apprenticeship program) for which the tests are used."

■ (c) Applying this principle to the present case, the Court holds that the questions used in evaluating the qualifications of employees for the Section Foreman job were related to the track work supervised by the job, were samples of the actual work performed by the Section Foreman, and were a legitimate and reasonable measure of job performance. Compare Buckner v. Goodyear Tire & Rubber Co., 339 F.Supp. 1108, 1113–1116 (N.D.Ala.1972), aff'd, 476 F.2d 1287 (5th Cir. 1973); Allen v. City of Mobile, 331 F.Supp. 1134, 1145–1147 (S.D.Ala.1971), aff'd, 466 F.2d 122 (5th Cir. 1972), rehearing denied, 466 F.2d 131 (5th Cir. 1972); Broussard v. Schlumberger Well Services, 315 F.Supp. 506 (S.D.Texas 1970).

(d) The Company also invokes the proposition that a showing of a relationship between a test and the job is not required unless it is initially shown that the test has disqualified black applicants "at a substantially higher rate than white applicants". Griggs v. Duke Power Co., supra; Cooper v. Allen, 467 F.2d 836, 838 (5th Cir. 1972); United States v. H. K. Porter Co., 296 F.Supp. 40, 76–77 (N.D.Ala.1968). In view of the holding that the questions here at issue were validly related to the performance of the Section Foreman job, it is not necessary to resolve this issue.

■ (e) It is not material that a formal validation study of the relationship between the questions and the job was not performed before the initial use of these questions. As the Fifth Circuit said in Cooper v. Allen, 467 F.2d 836, 839 (5th Cir. 1972), "There is no re-

quirement that prior to implementation of an intelligence test as an employment criterion the employer must validate its ability to forecast job performance." See also Buckner v. Goodyear Tire & Rubber Co., 339 F.Supp. 1108, 1115 (N. D.Ala.1972), aff'd 476 F.2d 1287 (5th Cir. 1973).

## VI.

### THE BATHHOUSE CLAIM

A. FINDINGS OF FACT:

1. A bathhouse has been maintained for many years for the use of the employees in the Furnace and Transportation Departments. Prior to 1968, one side of the bathhouse was used by white employees and another side was used by black employees.

2. The bathhouse was integrated in 1968 by the reassignment of lockers in order of the seniority of employees.

3. Following the integration of the bathhouse in 1968, various evasive tactics were tried by certain employees, such as attempts to swap lockers and to construct private showers in the plant. These tactics were halted by the Company.

4. The plaintiff has testified that his complaint regarding the bathhouse had reference to the period before the integration of the bathhouse in 1968 and that he has no complaint on the subject since that time.

B. CONCLUSIONS OF LAW:

■ The Company's action in integrating the bathhouse by the reassignment of lockers in seniority order in 1968 and in stopping attempts to swap lockers and build private shower facilities resulted in compliance with the legal obligation of an employer to provide non-segregated employee facilities. Witherspoon v. Mercury Freight Lines, 457 F.2d 496, 498 (5th Cir. 1972).

## VII.

### PATTERN OR PRACTICE CLAIMS

The plaintiff has relied on allegations concerning such matters as the racial composition of jobs. It would not be appropriate to resolve these matters in the present case, both because this is not a class action and because the resolution of these matters could entail consideration of the question of the extent to which they have been resolved by conciliation agreements which the Company entered into with the Equal Employment Opportunity Commission in 1968 and 1970.

■ However, they have been considered for the purpose authorized by the Courts. The applicable principle, as expressed by the Fifth Circuit, is that "Although statistical evidence of a pattern or practice of discrimination is of probative value in an individual discrimination case for the purpose of showing motive, intent, or purpose, . . . it is not determinative of an employer's reason for the action taken against the individual grievant." Terrell v. Feldstein Co., 468 F.2d 910, 911 (5th Cir. 1972). Having done so, the Court is of the opinion that even viewing these matters in the light argued by the plaintiff, they are not sufficient to overcome the evidence showing that the plaintiff has not been discriminated against. Compare Terrell v. Feldstein Co., supra; McFadden v. Baltimore Steamship Trade Association, 352 F.Supp. 403, 410 (D. Md.1973).

## VIII.

### JUDGMENT

A proposed judgment and order shall be submitted to the Court by counsel for the defendant.