Carrie SMITH, Plaintiff,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Defendant.

Civ. A. No. 74–G–225–S.

United States District Court,
N. D. Alabama, S. D.

June 30, 1975.

Houston L. Brown, Davis & Brown, Birmingham, Ala., for plaintiff.

William F. Gardner and Sydney F. Frazier, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

After hearing of this matter, non-jury, the court makes the following:

### FINDINGS OF FACT

1. Plaintiff brings suit under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, seeking injunctive, declaratory and monetary (back pay) relief. The complaint alleges racial discrimination in the hiring practices of the defendant.

2. Plaintiff is a black female who applied for a clerk position at the defendant's company.

Defendant St. Louis-San Francisco Railway Company (herein referred to as "Frisco") is a railroad carrier having its principal office in Missouri and a terminal in Birmingham, Alabama. The Birmingham terminal is the subject of this case.

3. The clerk jobs in the Birmingham terminal office perform various types of clerical and secretarial functions, such as typing, computer keypunching, and preparing freight bills. There was little if any hiring of clerks before 1967, the last hire prior to 1967 being in 1955. On the other hand, economic conditions have been such that no one has been employed for a clerk job since 1974.

During the period that significant employment occurred, namely 1967 to 1974, Frisco has employed an approximately equal number of black and white applicants for the clerk position at the Birmingham terminal by employing 28 black and 30 white applicants. Eleven of the 28 black applicants employed were employed prior to plaintiff's application in September of 1971. The remaining 17 were employed thereafter.

4. At the time in question, the procedure was that applications were taken whether there was or was not a job opening. After filling out employment applications, applicants were given the "General Clerical Test" and the "Wonderlic Personnel Test." The test papers were then sent to the Frisco personnel office in Springfield, Missouri, for grading. The personnel office was not aware of the race of any applicant. When a job came open applicants who passed the tests and were recommended by the Springfield office were given a typing test. The determinative factor

for selection of an applicant who passed these two steps was the applicant's job-related training and work experience.

5. The plaintiff applied for the clerk job at the Birmingham terminal on September 15, 1971. Four white applicants were given the General Clerical and Wonderlic tests at the same time and place as plaintiff. Neither the plaintiff nor any of the white applicants passed the clerical test, and neither the plaintiff nor any of the white applicants were employed by Frisco.

The job experience plaintiff listed on her application consisted of:

(1) Typist—New York City Finance Department—3 years.

(2) Typist—New York City Human Resources Commission—6–8 months.

Plaintiff had not at the time she applied worked anywhere since December 1968.

6. The General Clerical Test had a minimum passing score of 47, and the Wonderlic Personnel Test had a minimum passing score of 17. The tests taken by plaintiff and the four white applicants were graded in Springfield, Missouri. The scores were as follows:

| Name | GCT | WPT |
|------|-----|-----|
| Carrie Smith (plaintiff) | 19 | 17 |
| Jeanette Porter | 40 | 16 |
| Edward Laborde | 39 | 22 |
| Robert Nesmith | 44 | * |
| Robert Clark | 29 | 27 |

In sum, plaintiff passed the Wonderlic test, but fared poorly on the General Clerical Test. None of the white applicants passed the General Clerical Test.

7. Plaintiff alleges that at the time she applied and was tested she was harassed and intimidated by Mr. Clark, the secretary of the Birmingham terminal office, who took the application and administered the test. The plaintiff's contention is that Mr. Clark displayed racial prejudice by acting in a hostile and rude manner toward her. It was her belief that Mr. Clark spoke to and looked at her in a manner which showed "distrust, hate, and fear" while being courteous to and smiling at the four white applicants.

The court is satisfied from the evidence that there was not any racial bias on Mr. Clark's part. Plaintiff's contention of harassment in her encounter with Mr. Clark was not supported by the testimony of the other woman applicant (white), and was denied by Mr. Clark. The court finds that there was evidence indicating that plaintiff seems to believe herself the victim of racial prejudice generally. She suggested that part of the reason she has not held a regular job since 1968 is the result of racial prejudice. She feels she was subjected to racial bias and hostility during the three weeks she worked for the Jefferson County Board of Education in 1973.

The court has reason to question accusations of racial prejudice toward Mr. Clark. The evidence established that while in his position with Frisco Mr. Clark has recruited black applicants through sources such as the Urban League, and that his record of hiring at Frisco's Birmingham terminal reflects racial equality in both attitude and action. During the period Mr. Clark has been hiring he has employed 17 black applicants as compared to 14 white applicants for the clerk job applied for by plaintiff. The evidence indicates that he has a good working relationship with other black employees.

8. Plaintiff contends that Mr. Clark gave preferential assistance on the tests to one of the four white applicants, namely Ms. Jeanette Porter. Ms. Porter was not hired by Frisco. The court finds from the unrebutted evidence that all Mr. Clark did was to repeat the instructions given to all applicants, including plaintiff, prior to the start of each segment of the tests. Whether the repetition of these instructions was at Ms. Porter's request or not was immaterial since plaintiff would have benefitted

* There is no record of Robert Nesmith's score on this test.

from the repetition to the same extent as the other applicants.

9. The court finds no merit to plaintiff's assertion that Mr. Clark showed racial bias by allegedly telling plaintiff that her work experience in New York was not acceptable and that she had to have Alabama work experience. The facts clearly show that Mr. Clark has employed black applicants with out-of-state work experience, including New York.

10. From the evidence presented, it appears without question that plaintiff did not pass the General Clerical Test. Her contention that the record showing that she failed is not truthful, is unsubstantiated. The only conceivable way that this record of the plaintiff's score might be suspected of being false would be if someone in the Birmingham office had conspired with the Springfield personnel office to falsify it, since the Springfield office did not know the race of any applicant. The court is satisfied from the evidence that such was not the case.

11. The court finds that the mailing of physical examination form letters instead of written examination failure form letters to plaintiff and three of the other four applicants was simply the result of Mr. Clark having taken the wrong form letter from the file where these form letters were maintained, and that it was devoid of any racial implications or inferences.

12. As to plaintiff's general claim of racial discrimination in defendant's hiring practices, the court takes special interest in the fact that the first opening of the clerk's jobs after plaintiff applied was filled by the employment of a black applicant in November 1971. Although the plaintiff was advised by Frisco's letter of September 24, 1971, that she could again apply for employment in one year, she never again applied for employment with Frisco. However, another black applicant who was not employed in 1971 subsequently reapplied and was employed.

13. The gravamen of plaintiff's case is her allegation that the General Clerical Test and the Wonderlic Personnel Test were illegal on grounds that (1) the tests had a disproportionate racial effect, and (2) that the tests were not justified by "business necessity" because they had no relationship to job performance.

While the defendant discontinued these tests in 1972, the action was not a result of racial considerations. The court finds as a matter of fact that neither ground proposed by plaintiff is substantiated by the evidence.

14. As to the assertion that the tests had a disproportionate racial effect, the evidence is to the contrary. The unrebutted statistical evidence was that under the defendant's testing procedures during the years 1970 and 1971, the applicants recommended for further consideration based upon their test scores consisted of 22.5 per cent of the black applicants and 22.8 per cent of the white applicants. Conversely, those not recommended for further consideration based on test scores consisted of 77.5 per cent of the black applicants and 77.2 per cent of the white applicants. This evidence clearly established that the tests did not "operate to disqualify Negroes at a substantially higher rate than white applicants" as alleged in the complaint. On the contrary, the proportion of black and white applicants who passed and failed was nearly identical.

Neither does the statistical evidence indicate that the average of the numerical scores was lower for black applicants than for whites. Even if the evidence had shown the scores of blacks were lower than those of whites, this point would be immaterial in this case. Without dispute, the only factor considered was whether an applicant was above or below the minimum passing score, and no consideration was given to the numerical extent by which an applicant passed or failed.

15. As to the question of job-relatedness of the test, the evidence was clearly and unrebuttably in the defendant's

favor. In this case, there is no occasion to consider whether the Wonderlic test was or was not validly related to job performance. The determinative fact is that the plaintiff passed the Wonderlic test and that this test therefore did not have anything to do with her not being employed or considered for employment.

The evidence established, and the court finds, that the General Clerical Test was a reasonable measure of performance in training for and in the performance of the clerk jobs. With respect to training, the clerical training program was decribed through the testimony of Frisco's Supervisor of Training, Ms. Carlene Harvey (who is black). This evidence showed that the General Clerical Test was related in substantial measure to the successful completion of the clerical training program. Similarly, with respect to job performance, the relationship between the test and the jobs was established by the testimony of a qualified expert witness. On these facts, this test was a legitimate and reasonable measure of job performance.

16. Having found that the evidence clearly and unrebuttably demonstrates the validity of these tests, this case does not require findings that the plaintiff would otherwise be entitled to employment. *See, Cooper v. Allen,* 467 F.2d 836 (5th Cir. 1972), rehearing after remand, 493 F.2d 765 (5th Cir. 1974). However, the court is impressed with evidence directed to this point. Obviously, no one could be hired until a job came open. Since there was no job available at the time of plaintiff's application, she was not immediately entitled to a job. Further, the procedure illustrated by the evidence was that applicants who passed the clerical and typing tests were evaluated for employment based on their previous job-related training and work experience for the purpose of selecting the best qualified applicant.

It was (and is) Frisco's policy that employment applications remain active for one year. Therefore, if the tests had not been in use in 1971, the plaintiff would have been considered for job openings occurring during the one-year period from September 15, 1971, to September 15, 1972. During this period of time, there were 11 openings in the clerk's jobs, of which seven were filled by the employment of black applicants and four by white applicants.

Of the seven black applicants employed, all but one had had college or business college education, and all but one had had clerical job experience. The one black applicant without college had had several years experience as a key punch operator and in clerical work. The black applicant without clerical work experience had had two years of college in business and accounting. Of the four white applicants employed, all but one had completed a key punch operator course in business college and had clerical work experience. The one white applicant without business college experience had eight years experience in a very similar type clerical employment.

On this evidence, the court finds that the plaintiff was not better qualified than the seven black and four white applicants who were employed during the one-year period between September of 1971 and September of 1972. Therefore, based on her qualifications alone the plaintiff would not have been entitled to a job during this period.

In summary, the evidence indicates clearly that there has not been racial discrimination in the hiring practices of the defendant with regard to the clerk's job at the Birmingham terminal, that the evidence was insufficient to support plaintiff's allegations that she was the subject of racial prejudice or discrimination in her application for employment by defendant, and that the tests administered to her were not applied to her so as to discriminate because of race.

## CONCLUSIONS OF LAW

1. Section 703(a)–(d) of Title VII of the Civil Rights Act of 1964 delineates unlawful employment practices on the part of employers, labor unions and em-

ployment agencies. 42 U.S.C. § 2000e–2(a)–(d). However, § 703(h) specifically provides that:

> Notwithstanding any other provision of this title [42 U.S.C. § 2000e–2000e–17], it shall not be . . . an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(h).

■■ 2. Pursuant to the authority granted by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–12, the Equal Employment Opportunity Commission (hereinafter "EEOC") issued the Guidelines on Employee Selection Procedures. 29 Code Fed.Reg. § 1607. The Guidelines provide that use of tests which adversely affect hiring of members of the class protected by Title VII constitutes discrimination unless validated on the basis of business necessity, etc. The Guidelines are entitled to the highest deference by the courts. While this court finds from the evidence that the tests in question have been validated within the ambit of the Guidelines, the question of validation within the Guidelines was apparently also decided favorably to defendant by the EEOC in its dismissal of plaintiff's charge on December 7, 1973. The tests in question have therefore satisfied the Guidelines.

3. The seminal case on the validity of hiring tests is *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971). In that case the Supreme Court held that the requirements of a high school education or the passing of a general intelligence test that operate to disqualify Negroes at a substantially higher rate than white applicants is prohibited racial discrimination where it is not shown that satisfaction of either of these requirements bears a demonstrable relationship to successful performance of the jobs for which it

was used. The Court thereby created first a threshold issue as to the propriety of any hiring tests, and a secondary issue which might justify a prohibited test. The threshold issue is whether the test operates to disqualify blacks at a substantially higher rate than whites. This court has found that the evidence establishes that there was no substantial disparity between the success of blacks and whites on the tests in question.

■ As recognized by the Tenth Circuit Court of Appeals, an applicant for a position must establish that use of criteria used by the company in screening job applicants has the effect of discriminating against minority groups; and that where he fails to do this, no prima facie case of such discrimination is established and the company is not called upon to show that the tests fulfilled a genuine business need and is permissible under the statute. *Woods v. North American Rockwell Corp.*, 480 F.2d 644 (10th Cir. 1973). On the question of discriminatory effect of the test, plaintiff offered no proof whatsoever. No prima facie case was ever made. Defendant did, however, conclusively establish the absence of any discriminatory effect.

■ 4. This Circuit has established that an employment test which does not have a disproportionate racial effect is lawful. As the Court of Appeals said in *Hester v. Southern Railway*, 497 F.2d 1374 at 1381 (5th Cir. 1974):

> [N]onvalidated tests in subjective hiring procedures are not violative of Title VII per se. Title VII comes into play only when such practices result in discrimination. At that point, the burden of producing evidence shifts to the employer, who must offer satisfactory justification for his procedures. As stated in *United States v. H. K. Porter Co.*, N.D.Ala. (1968), 296 F. Supp. 40, 76–77:
>
>> "The courts must decide the cases which come before them on the evidence and not on abstract propositions."

See also *United States v. Georgia Power Co.*, 474 F.2d 906 (5th Cir. 1973).

■ Plaintiff has therefore failed to cross the threshold. Charges that the general hiring practices of Frisco have been discriminatory in nature are neither material nor substantiated. The principle is well established that defendant's general employment practices are relevant in the resolution of employment discrimination claims. *Burns v. Thiokol Chemical Corporation*, 483 F.2d 300 (5th Cir. 1973). This principle, however, does not per se challenge the validity of tests used as a method to adduce the most qualified person for a position. Neither does the general proposition that black persons do not fare as well as white persons on tests because of cultural or educational disadvantages. The evidence, quite to the contrary, demonstrates that on the tests in question blacks fared less than a percentage point as well as whites on the whole. As the Fifth Circuit said in *Hester v. Southern Railway Company, supra* at 1382:

> The missing ingredient in the proof here was the necessary showing of discrimination. Without such proof the district court lacked authority to enjoin further use of the testing and interviewing procedures by Southern for selection of Data Typist.

■ 5. Obviously, whether defendant can show a business necessity (i. e., job-relatedness) for any tests given to a job applicant is a fact question. The Guidelines of the EEOC are of benefit in establishing the boundaries of the legal sufficiency of any business necessity explanation. Although the interpretation of the Guidelines is entitled to great deference, it is not necessary that every employer comply "with each technical form of validation procedure set out [in the Guidelines]." *United States v. Georgia Power Company, supra* at 913. As stated in the Findings, defendant has demonstrated that the tests were an adequate measure of the success of an applicant during the training program. Expert testimony provided as well the validation required by the Guidelines.

■ 6. Plaintiff suggests that an employer is obligated to validate a test at the time it is first used. This is not the law. The applicable principle, expressed by both the Fifth Circuit and this court, is that a test need not be validated at the time it is adopted or used and that validation in connection with a law suit satisfies the employer's obligation. *Cooper v. Allen*, 467 F.2d 836, 839 (5th Cir. 1972); *Wilson v. Woodward Iron Co.*, 362 F.Supp. 886, 895 (N.D. Ala.1973); *Buckner v. Goodyear Tire & Rubber Co.*, 339 F.Supp. 1108 (N.D.Ala. 1972), aff'd, 476 F.2d 1287 (5th Cir. 1973).

■ 7. Plaintiff's prayer for back pay requires a causative connection between the employment procedure in question and the claimed injury to the plaintiff. The precedent applicable to this issue is set forth in *Cooper v. Allen, supra.* The substance of the decisions is that an applicant who was disqualified on the basis of a test which does not meet the standards required by the law is not automatically entitled to court ordered employment and back pay and will not be so entitled if the defendant can "prove by clear and convincing evidence that . . . he [plaintiff] would not have been hired even absent the testing requirement." *Id.* at 841. Accordingly, had plaintiff been able to cross the threshold and make out a prima facie case, recovery would not be automatic.

■ As noted in the Findings of Fact, the plaintiff's job-related training and work experience would not have qualified her for a job when considered along with the qualifications of applicants (both black and white) who were ultimately employed. It would seem clear that previous job-related training and work experience are legitimate employment criteria. *See, Taylor v. Safeway Stores*, 365 F.Supp. 468 (D.Colo. 1973), in which the court stated that:

> There is nothing so far as we can determine in the provisions of Title VII

that outlaws even by implication relevant work experience as an employment criterion. On the contrary, *Griggs v. Duke Power Company, supra,* ordains that an applicant's qualifications shall be the sole proper basis for hiring decision. At 476.

Conclusively, as a matter of law, the plaintiff, in absence of a showing of entitlement to the job, cannot recover back pay.

8. This court has not hesitated to sustain a claim of discrimination when the evidence showed racially prejudiced actions against a plaintiff. *Allen v. Ross Neely Express,* Civil Action No. 73–G–628–S (N.D.Ala.1974). However, where as here, plaintiff offers no evidence to meet her burden as established by the law, only one conclusion is possible. The court is convinced that neither the test in question nor the circumstances of plaintiff's application were discriminatory.

Judgment and Order in conformity with the foregoing Findings of Fact and Conclusions of Law will be entered.